UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROLAND COCKFIELD                :

v.                              :     No. 3:00cv564(JBA)
                                :
UNITED TECHNOLOGIES CORP.,      :
PRATT & WHITNEY DIVISION        :

## Memorandum of Opinion and Order

Plaintiff Roland Cockfield, employed by defendant United Technologies Corp., Pratt & Whitney Division ("Pratt") from December 1964 until his termination on June 28, 1991, alleges Pratt fired him on account of his race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. and not, as Pratt contends, because of violation of the company's rules. The Court has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f). The matter was tried to the Court between January 20 and 22, 2004, and the following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

I.  **Findings of Fact**

   A.  **Background**

   Roland Cockfield, who is African American, was, at all times relevant to the present case, a resident of Connecticut. Pratt is a Connecticut corporation, organized and existing pursuant to the laws of Connecticut and duly authorized to conduct business

1

therein.  Pratt maintains a business at Aircraft Road, Middletown, Connecticut.

Pratt initially hired Cockfield in December 1964 as an entry-level machine operator.  Sometime around 1969 or 1970, Cockfield moved into plant protection.  In approximately July 1984, Pratt promoted Cockfield to the position of Senior Plant Protection Officer, which resulted in Cockfield assuming supervisory responsibilities.  All of Cockfield's employment with Pratt was at Pratt's Middletown facility.  As a Senior Plant Protection Officer, Cockfield's duties included protecting all of Pratt's facilities, contents and personnel, conducting site inspections to ensure proper fire protection, and ensuring adequate plant protection coverage.

Pratt's policies for its Plant Protection Department are contained in Pratt's Plant Protection Manual (the "Manual").  All of Pratt's Plant Protection Officers generally receive a copy of the Manual, and Cockfield did while employed.  Pratt requires its Plant Protection Officers to learn, know, follow and apply the policies set forth in the Manual, including requirements that Plant Protection Officers operate on the basis of special rules, regulations and standards of personal conduct, performance and appearance.

Fred Jones was Supervisor of Protective Services from approximately 1989 until he retired in April 1999.  In that

position, he was Cockfield's supervisor. Jones had been an employee of Pratt since 1968, having worked at different times as an apparatus driver, fire lieutenant, shift supervisor, and his ultimate position as Supervisor of Protective Services. He participated in the decision to terminate Cockfield with two others: his boss Chris Walsh, personnel manager of Pratt's Middletown facility; and Dave McGrath, Pratt's manager of all plant protection whose office was in East Hartford. Jones had supervised Cockfield since 1984, and had never heard or received an allegation of Cockfield having been engaged in stealing. From 1989-1991, Jones gave Cockfield two performance-based raises. Also, Jones testified that Cockfield was doing a good job during the 1990-1991 time frame, that he executed good judgment on the job, and that his judgment was relied on by Jones. In 1991, there were six salaried employees working under Jones, three senior plant protection officers and three shift supervisors, of whom Cockfield was the sole African American.

### B.   Events Leading Up to and Termination of Cockfield

Sometime in June 1991, an anonymous note was submitted to Pratt Vice President Bean, who in turn sent the note to Chris Walsh. The note states,

> I would like to complain about a supervisor in the Middletown Plant Protection Department who is stealing food from the cafeteria here in building 10. Roland Cockfield comes here to eat dinner several times a week. He never pays for the meals and when supervisor Bill Schiffert spoke to him about it, he got very

3

> angry.
>
> I followed him thru the line and when he skipped past the cash register, I told him to go back and pay for his food, he said "look mother fuccker (sic), you just mind your own fucken (sic) business". he has since harassed me on two separate occasions. He sometime (sic) comes here around 7:30 in the morning foor (sic) breakfast and does the same thing.
>
> I think if he can gert (sic) away without paying for his meals, then we should all be allowed free meals. I have to wonder what else he isstealing (sic). I don't want to sign my name as he will continue to hasass (sic) me. He is a very nasty person.

Def.'s Ex. B. The cafeteria located in Building 10 was operated by ARA Services, an outside vendor providing food services to Pratt. Jones infrequently visited that cafeteria, approximately once per month, but never ate there. Cockfield ate breakfast and lunch there almost every day.

On June 17, 1991, Walsh had Jones come to his office and gave Jones the note. Notwithstanding his long term relationship with Cockfield, and Cockfield's good work record, Jones did not approach Cockfield to discuss the allegations or investigate the matter himself, but rather informed Walsh that the best way to handle the situation would be to have internal security investigate.

Jones next forwarded the note to internal security, specifically Robert Begley, the supervisor of Pratt's Internal

Security Department,[1] and requested a formal investigation into the note's allegations. At trial, Jones testified that he requested the formal investigation for several reasons: the allegation in the note was about stealing food and therefore he envisioned a person entering the cafeteria and eating food without paying for it; he did not have adequate resources to perform an investigation; and he did not want individuals who knew Cockfield to be involved in an investigation.[2]

Begley met with Jones to get a description of Cockfield and find out where Cockfield ate lunch and generally about his routine. Jones showed Begley a picture of Cockfield and informed Begley that Cockfield had worked at Pratt for a long time. In addition, to help with the investigation, Begley got McGrath's approval to bring in an outside investigator unknown to the guards at Pratt's Middletown facility. This individual was an employee at Hamilton Standard named Phelps.

On June 26, 1991, at approximately 10:30 a.m., Cockfield drove up to a gate at the Middletown facility for the purpose of going to the cafeteria in Building 10. After obtaining clearance

---

[1] Begley had formerly worked as a police officer for the town of Avon, Connecticut, and had extensive experience in positions related to corporate security.

[2] Differences in Begley's version of his initial interactions with Jones are not material. Begley testified that after Jones requested the investigation, he spoke with McGrath who directed him to meet with Jones and that it was then when he met with Jones that Jones gave him the note. Begley then notified McGrath presumably about the contents of the note and his meeting with Jones and McGrath directed Begley to pursue the investigation.

and beginning to move through the gate, Cockfield heard over his truck radio Jones making a call. Cockfield recognized Jones' voice but was not aware of the content of the message being given. He later learned that Jones through code had alerted internal security to Cockfield's presence and movement toward the cafeteria. Begley, on his way to supervise Cockfield, spoke with Jones. The content of this conversation was not clearly revealed by the testimony; in addition, the temporal relation between Jones' alerting internal security and his speaking to Begley is not clear. Jones did testify that he did not direct Begley how to carry out surveillance on Cockfield.

At approximately 10:55 a.m., Begley and Phelps met at the cafeteria in Building 10 to conduct surveillance on the cashier line. Edith Wiknik, an employee of ARA, was working as the cashier at the time.[3] Begley and Phelps observed Cockfield enter the cafeteria, get a tray, put a hotdog, roll, and cup of water on the tray, and proceed to Wiknik's cash register. Begley and Phelps got their own trays, placed beverages on them, and slid into line behind Cockfield. They observed Cockfield hand Wiknik a five dollar bill, Wiknik take the bill, remove five one dollar bills from the cash register, count and hand the bills to Cockfield, and then watched as Cockfield took the bills, walked away, and seated himself in the cafeteria to eat lunch.

---

[3] Ms. Wiknik is now deceased.

Cockfield did not count his change and did not appear nervous. Begley and Phelps could not see from their vantage point whether or not Wiknik had rung up anything on the cash register.[4]

At approximately 11:00 a.m., after finishing lunch, Cockfield left Building 10. Begley and Phelps followed him outside and confronted him. They identified themselves as internal security and asked whether Cockfield had been receiving an occasional free meal from the cafeteria. Cockfield reacted with surprise and responded that he had been. Begley and Phelps told Cockfield that he was not permitted to do that, to which Cockfield responded that he had never been told that receiving free food was not allowed. Begley and Phelps then asked whether Cockfield would be willing to give a statement, and Cockfield replied that he would do so. Begley and Phelps instructed Cockfield to return to work, which he did for a short period until called by Begley to give a statement. After Begley and Cockfield returned to internal security but before Cockfield gave a statement, Begley contacted Jones, telling him something of what had transpired and that he was in the process of taking Cockfield's statement and would also be gathering additional information.

During the interview, Begley and Phelps reiterated that

---

[4] Begley also testified that he and Phelps did not see Wiknik write anything down during the transaction.

Cockfield was not permitted to receive free lunches. When Cockfield queried why, they told him it was illegal. They also informed him that he did not need to receive free hot dogs because he was making sufficient income to afford to purchase them. Cockfield agreed but explained about his relationship with Wiknik, how he had helped her in the past and that, as a result and over his objection, Wiknik insisted on providing Cockfield with free lunches in gratitude, telling him that she had authorization to do so. The investigators admonished Cockfield that what he did "was a stupid thing to do;" Cockfield's response was "maybe it was a dumb thing to do." Finally, toward the end of the interrogation, Cockfield told Begley and Phelps that if what he had done was wrong, he would never do it again and that he never had any intention of harming Wiknik. Begley and Phelps replied "No, I guess you won't [do that again]." Tr. [Doc. #117] at 54:1.

Cockfield's statements as taken down by Begley, which Begley read back to Cockfield and Cockfield signed after dictating and initialing some corrections, read as follows,

> I, Roland Cockfield, am 49 years of age.... I have been employed by the P&W Business Unit for approximately 27 years and am presently a Senior Plant Protection Officer working under the supervision of Fred Jones.
>
> I understand I am being interviewed in regard to an allegation that I have accepted free lunches from the P&W Middletown Building #10 cafeteria. Specifically, it is alleged that on June 26, 1991, at approximately 10:55a.m., I was observed by Investigators Begley and Phelps receiving a

8

> free lunch (hot dog) at the Building #10 cafeteria. I was
> observed giving the cashier a $5.00 bill to pay for the
> hotdog and receiving 5 single dollars in return.
>
> On June 26, 1991, at approximately 10:55a.m., while in the
> Building #10 cafeteria, I proceeded to select a hotdog as I
> walked thru the service line. I also took a cup of water.
> I then approached the cashier (Edith) and gave her a $5.00
> bill to pay for my $1.50 hotdog. Edith returned 5 one
> dollar bills to me. I then sat down at the first table and
> ate my lunch. Approximately 20 minutes later, as I was
> exiting the cafeteria thru the kitchen, Investigator Begley
> stopped me. He explained how Internal Security had received
> complaints about my receiving free lunches. I admitted to
> both Investigators Begley and Phelps that I had just
> received a free lunch.
>
> I have been receiving a free or reduced price lunches from
> Cafeteria #10 for approximately 6 months. Sometimes Edith
> accepts my money for the meals and sometimes she returns all
> or part of the money to me.
>
> I have never made any agreements with Edith in regard to
> free lunches - she has simply decided, on her own, to give
> me free lunches sometimes. She is a very nice person.
>
> I am not aware of any other employees, including
> Fire/Security personnel, who have received free lunches.
>
> I do not feel like I am stealing if the cashier wants to
> give me a free lunch. I did not try to conceal this
> activity. I have always gone to the cashier to pay. I have
> never skipped the cashier and just walked over to the table.
> However, at times when the cashier's line was long, I went
> to my table, left my tray there, and then returned to pay
> the cashier. At this time, I realize it was a dumb thing to
> do. I regret my actions. I would never want to get Edith
> in trouble.

Def.'s Ex. F-2 (Statement of Roland Cockfield dated 6/26/1991 at 11:25 a.m. and signed by Roland Cockfield on 6/26/1991 at 12:05 p.m.). Begley and Phelps then told Cockfield to go back to work and that Jones would get in contact with him. Less than one minute after leaving Begley and Phelps, as Cockfield left the

9

building in which he was interrogated, he encountered Jones entering the building. Jones asked how Cockfied was doing, and Cockfield responded "pretty good." Jones replied, "I guess it's not going pretty good with you today." Cockfield queried his meaning, and Jones stated "Well not too good with you there, I guess, with the incident down at the Building 10 cafeteria."

Also on June 26, 1991, Begley and Phelps interviewed Wiknik. Wiknik's statement reads as follows:

> I, Edith Wiknik, ..., in the employ of ARA, give the following voluntary and true statement to Investigators Begley and Phelps, whom I know to be employed by Internal Security, Pratt and Whitney, of my own free will. No threats or promises have been made to me by anyone.
>
> I, Edith Wiknik, am 61 years of age.... I have been employed as a Cashier for ARA for 15 years.
>
> I understand I am being interviewed relative to any information I possess in regard to free lunches P&W Security Supervisor Roland Cockfield received from cafeteria #10 in the P&W Middletown facility.
>
> Presently, I am an ARA cashier at the P&W Middletown Building #10 cafeteria. About 1 ½ years ago I was diagnosed as having liver cancer. Roland Cockfield had asked me about my illness. He was very nice to me, in fact, he even tried to get me a special parking permit. As a way of showing my appreciation to him, I would not accept any money from him for lunches and an occasional breakfast at the Building #10 cafeteria. Roland would give me the money, however, I would return the same amount of money to him. For example, if he gave me a $5.00 bill to pay for his lunch, I would return 4 singles and 4 quarters to him. There was never any pre-arranged plan discussed between us on how I would give him the free meal. Again, Roland never asked for the free lunches, I gave them to him as a sign of my appreciation. I would actually ring the cost of the meal up on the register and, at the end of the day, I

> would balance the tape with my own money. Roland had no idea I was paying for his meals. I was actually going to talk to him about ending the free meals because an employee had complained about it. This practice of giving Roland a free lunch had only gone on for the past 1 ½ years.
>
> Roland is the only employee I have given free lunches to. I am not aware of any other employees who have received free meals at our cafeteria.
>
> I would like to note that sometimes Roland, because the cashier line was so long, would take his tray/meal to his table and then return to the register.
>
> Today, June 26, 1991, Roland came thru the cashier line with a hot dog and what appeared to be a soda. He gave me a $5.00 bill to pay for the $2.00 charge and I returned 5 single dollar bills to him. In other words, I gave him a free lunch.
>
> I sincerely regret my actions. I have always put my money into the register to balance Roland's free meals. He is a very nice man and I hope we do not get into trouble over this.
>
> I, Edith Wiknik, have read the above statement consisting of 4 pages and the statement has been read to me by Investigator Begley.

Def.'s Ex. G-1 (Statement of Edith Wiknik dated 6/26/1991 at 1:00 p.m. and signed by Edith Wiknik at 1:35 p.m.).

It appears from Cockfield's testimony and Cockfield's and Wiknik's statements that much of the following description of their relationship which was the basis for the free meals was given to Begley and Phelps during their interrogation of Cockfield and Wiknik. See e.g. Tr. [Doc. #117] at 47:6-49:2. The relationship developed sometime in January, 1991 when Cockfield began to help Wiknik with cafeteria tasks such as

lifting heavy milk containers. Wiknik needed the help because she was suffering from liver cancer and her condition had left her frail and weak. However, Wiknik was a proud person and did not want to stay at home but desired to continue working and earning her income. After Cockfield found out about Wiknik's illness, he began to go out of his way to help her, in part because he knew from his father's bout with cancer what difficulty the disease can inflict upon the body. At some point during their relationship, Wiknik occasionally began to refuse Cockfield's offer of payment for a meal, saying, for example, "I told you lunch is on me" or "I told you you don't owe me anything, I'm doing this out of the goodness of my heart," and becoming offended when Cockfield would insist on paying for the meal. Sometimes Cockfield would pay by placing his payment near the cash register. Other times, he would take his food to his seat before returning to the cash register to tender payment.[5] Sometimes Wiknik would accept Cockfield's payment and sometimes she would refuse. The one constant was Cockfield always tendered

---

[5] Plaintiff's witnesses Robert Graves, Robert Malcolm, and Billy Mitchell, all long-time Pratt employees, testified to various aspects of the way in which the cafeteria in Building 10 was run during the period from 1989 to 1991. The picture that emerged was that of an informal setting in which one or two workers would often shoulder responsibility for servicing the entire cafeteria. It was not unusual for individuals to take food, walk by the cashier, and return after eating to pay for their snack or meal. It was also not unusual for individuals to pay for small items such as coffee by simply putting their payment next to the cash register. The informal practices derived in part from the employees managing the cafeteria being tied up with various duties and thus being unavailable to attend the register for each and every customer.

payment. Jones was aware of Cockfield's relationship with Wiknik prior to the investigation. Cockfield had come into Jones' office to inform him that Wiknik was sick with liver cancer and to request Jones' help in obtaining a medical pass to allow Wiknik to park closer to the cafeteria in Building 10.

After taking Cockfield's and Wiknik's statements, Begley telephoned McGrath and sent both written statements to his office in East Hartford. Begley also contacted Jones sometime after taking Wiknik's statement, informing him of the content of her statement and indicating that he would next pursue taking Schiffert's statement. Next, Jones, Walsh, and Begley met to discuss the situation, after which Jones made the decision to suspend Cockfield. Jones testified that he based his decision on the two statements of Cockfield and Wiknik and particularly "the deception at the cash register" and the "theft."

Later in the afternoon of June 26, 1991 at around 2:00 p.m., Jones approached Cockfield at security headquarters and called him back to his office, where he told Cockfield he was being suspended indefinitely. Cockfield asked the basis of the suspension and Jones replied "for the incident in Building 10 cafeteria." Cockfield then asked why, given Jones' experience and knowledge of Cockfield and his work record, Jones had not just approached Cockfield and explained the problem instead of launching an internal investigation. Jones told Cockfield that,

if the decision had been left to Jones, Jones would have followed that course of action but the anonymous note went to upper management and Jones had nothing to do with the investigation. Cockfield asked whether he could use the phone to telephone the vice president working with plant protection officers at the time, but Jones refused, informing Cockfield that he had no more privileges at Pratt because he was on suspension and directing him to clean out his locker, leave the premises, and wait for a call from Jones. Cockfield retrieved the personal belongings from his locker, and left the premises in a state of shock and disbelief over the suspension, believing that, when called, he would explain what happened and things would get straightened out.

Upon arriving at home, Cockfield telephoned McGrath, leaving a message requesting a return phone call. McGrath did not call back. The next morning, June 27, 1991, Cockfield reached McGrath, whom he had known since first entering the security department, and began to explain the prior day's events and asked for an update on the investigation about the incident in Building 10. McGrath told Cockfield that he did not know details but that, after all reports came in, he would call him.

Later on June 27, Begley took Schiffert's statement:

> I, William Schiffert, am 48 years of age.... I have been employed by the P&W Business Unit for approximately 27 years and am presently a Manufacturing Support Supervisor working under the supervision of

14

David Gray.

I understand I am being interviewed in regard to any knowledge I have regarding Security Supervisor Roland Cockfield receiving free lunches at cafeteria #10.

Back in 1987 I observed several hourly employees enter thru the backdoor of cafeteria #10, pick up coffee and donuts, and leave without paying for them. Edith, the cashier, would simply watch them walk by without paying. She would socialize with them as if they were friends with her. Other employees paid for their food. I spoke to Edith about this practice and she said she would address the situation. Prior to this incident, I had spoken to her about a salary person from Building #150, John Gustaitus, who had been receiving free lunches at cafeteria #10. Edith spoke to Gustaitus the next day and the free lunches ended for him.

Also, during the summer of 1990, I observed Security Supervisor Roland Cockfield, on several occasions, walk past the cashier (Edith) without paying and sit down at the first table and eat his lunch, when he finished his lunch, he would then leave. He did not pay for his lunches. I talked to Edith about Cockfield's free lunches and she denied it. She said, "Oh no, he pays for his lunches." After my conversation with Edith, Cockfield changed his routine. Now he goes thru the line and hands Edith money. For example, if Roland's charge came to $2.31, he would give her a $5.00 bill and receive four (4) singles and four (4) quarters from her. This would give the appearance he was getting legitimate change from her. Sometimes the cash register would show "0" as she rang his order.

In March of 1991, I again observed Cockfield not pay for his lunch. I was sitting at the first table where Cockfield normally sits when I observed him give Edith a $5.00 bill and she returned the $5.00 bill to him. At the time, there was nobody behind him in line and he had a full meal on his tray. In fact, he sat down at the same table as me and said, "How are you doing?" I watched him place the $5.00 bill back into his pocket. Later, after lunch, I returned to the cafeteria and said to Edith, "I saw Roland not pay for his lunch today." She seemed very nervous but did not reply. I said, "I thought we were going to stop this." I then walked off. She was obviously very upset. Within 15

> minutes of my conversation with Edith, Cockfield called to me while I was in my maintenance area. He said, "What's this I hear you are accusing me of not paying for my lunches. If you want we can go up to Personnel and talk about this." I told him I wasn't accusing him of anything. He mumbled something and walked off. Since that conversation I still have observed him taking free lunches. Also since my conversation with Cockfield, he has been very "cold" to me.
>
> On June 26, 1991, at approximately 10:55a.m., while standing in the cafeteria #10 cashier line, I observed Roland Cockfield standing directly behind me in line. After I paid for my order, I stayed there and observed Edith ring Cockfield's order for $2.00. He had a hotdog and beverage. It looked like he had a bill or bills crumbled up in his hand. He then handed the bill(s) to Edith who took the bill(s) and, after a slight delay, returned some bills to Cockfield. I also noticed Internal Security Investigator Begley along with another investigator standing in line, right next to Cockfield. I then exited the cafeteria.

Def.'s Ex. G-1 (Statement of William Schiffert dated 6/27/1991 at 10:25 a.m. and signed by William Schiffert on 6/27/1991 at 11:25 a.m.). Schiffert worked in the maintenance department as a supervisor but there was no explanation why, on June 26, 1991, Schiffert happened to be in the cashier line just ahead of Cockfield at precisely the time Begley and Phelps were just behind him during Cockfield's hotdog transaction. Neither Jones nor Begley testified that Schiffert was at all involved in the investigation of Cockfield's free lunches. In fact, Jones did not speak with Schiffert prior to terminating Cockfield. Jones did not know whether Schiffert had reported the other free food incidents contained in his statement, did not question Schiffert on whether he had failed to report them (Schiffert had an

16

obligation as a supervisor to report theft), was unaware whether Walsh or McGrath questioned Schiffert on these matters, and did not ask Schiffert why he had failed to report Cockfield's free lunches.  Although Jones testified that he considered Schiffert's report of hourly workers getting free food and coffee stealing, he made no attempt to find out who the hourly workers were, and made no request of internal security to do an investigation.  Jones also took no steps to generate an investigation on John Gustaitus and was not aware of any such investigation being requested or initiated by anyone.  Begley also made no attempt to investigate John Gustaitus, because Schiffert's statement claimed that the lunches had ended for him.

After taking Schiffert's statement, Begley contacted Jones and relayed the contents.  Begley also forwarded typed copies of all three statements to Jones.  Jones decided to wait to make a decision on Cockfield's termination for an opportunity to meet with Walsh and McGrath.  Apparently at this juncture, Cockfield telephoned Jones again and asked for an update on the Building 10 incident investigation; Jones replied that he was waiting for information from upper management.  Cockfield asked for the reason supporting his suspension and Jones simply reiterated that he was waiting for upper management, saying "This is out of my hands, this is being handled on upper level, management level, upper management level."

Jones then had a telephone conference with Walsh and McGrath regarding Cockfield's situation. Both Walsh and McGrath knew Cockfield was African American and were aware how long Cockfield had worked for Pratt. Jones recalled little of this conversation at trial, but remembered that it lasted approximately one hour, that Begley was patched in through a speaker phone at some point, and that the three reviewed the statements of Cockfield, Wiknik, and Schiffert. Jones also testified that the three identified ARA as the entity from which they believed Cockfield had stolen. At the end of the meeting, Walsh and McGrath asked Jones for his recommendation, Jones recommended termination and the other two agreed. The termination decision did not involve any review of Cockfield's past employment record, and neither Walsh nor McGrath directed Jones to undertake any further investigation.[6]

The next day, June 28, 1991, Cockfield again telephoned Jones. According to Cockfield, Jones told Cockfield he was still waiting to receive information from upper management and that he would call Cockfield back. A half hour later, Jones telephoned Cockfield to inform him that upper management had decided on termination. Cockfield said that he could not believe it and Jones said that that was the decision and asked Cockfield to turn in his Pratt clothing the following Monday.

---

[6] There is no process in Pratt's policies regarding termination that allows a terminated salaried employee to appeal or address the termination.

At the time Cockfield returned to Pratt to turn in his clothing, badge, and keys, and to inquire on the status of his insurance and savings plans, he was not provided any written confirmation of his termination.

Three weeks passed and Cockfield, having received no official notification from Pratt, telephoned Jones and asked for official documentation of his termination for purposes of filing for unemployment compensation. Jones sent Cockfield a letter dated July 22, 1991, the body of which reads,

> This letter is to confirm your termination from Pratt & Whitney effective Friday, June 28, 1991, due to violations of Company rules.

Def.'s Ex. I. Cockfield never received a termination slip from Pratt. The first attorney who represented Cockfield in regard to the Building 10 incident requested Cockfield's personnel file, in which was included an "Employment Termination Record" dated July 1, 1991. The pink slip listed "Violations of Company Rules" as an explanation for his dismissal with the code 2.103 entered in a box labeled "Focal Pt. Pers. Dept. Use". The number 2.103 apparently represented some kind of code for theft. In the box labeled "rehire status," Cockfield's attendance was checked as excellent and general ability and attitude as good. The pink slip was signed by Jones.[7]

---

[7] In 13 years since his termination, no one from Pratt ever told Cockfield what company rule he supposedly violated by receiving free lunches from Wiknik. It was not until the trial testimony of Jones that he learned what Pratt rules defendant claimed he had violated. Cockfield testified that

19