Also on July 1, 1991, Begley prepared a final report and submitted it to the personnel department, Jones, and McGrath. The report is titled "Theft from Cafeteria," and it reads:

### SYNOPSIS

> An anonymous letter alleged that Cockfield was not paying for his lunches. An Internal Security surveillance confirmed the allegation. Cockfield, in a written statement, admitted not paying for his lunches.

### DETAILS

> On June 17, 1991, P&W Middletown Plant Security Manager Fred Jones,..., reported the receipt of an anonymous letter claiming Security Supervisor Roland Cockfield was not paying for his meals at the Building #10 Cafeteria. The letter also indicated that Manufacturing Support Supervisor William Schiffert,..., had spoken to Cockfield about the free meals, and as a result of the conversation, Cockfield became angry. ...
>
> Schiffert stated that during the summer of 1990, he observed Cockfield, on several occasions, walk past the cashier at Cafeteria #10 without paying for his lunch. According to Schiffert, ARA Cashier Edith Wiknik,..., did not challenge Cockfield as he walked past her. Schiffert said he questioned Wiknik about Cockfield's free lunches and she claimed he paid for them. Schiffert further stated that after his conversation with Wiknik, Cockfield changed his routine. More recently, Cockfield gave Wiknik money at the register and received the same amount in return. Schiffert said that in March 1991, he observed Cockfield give a five dollar bill to Wiknik and she returned the same five dollar bill to him. Cockfield then sat down at a table near the cash register and ate his lunch. Schiffert said he approached Wiknik and stated, "I thought we were going to stop this." Wiknik made no comment, however, she appeared upset. Approximately 15 minutes later Cockfield approached him and said, "What's this I hear you are accusing me of not paying for my lunches.

---

he hired legal counsel in the first place to learn what rule/s he had violated and to get his job back.

20

If you want we can go to Personnel and talk about this." Schiffert, who told Cockfield he had not accused him of anything, noted that Cockfield's free lunches have continued.

On June 26, 1991, at approximately 10:55a.m. Investigators Begley and Phelps observed Cockfield enter the Building #10 Cafeteria. Cockfield placed a hotdog and beverage on his tray and proceeded to the cashier line. Investigators Begley and Phelps stood in line directly behind Cockfield. Cockfield approached Wiknik and handed her a partially folded five dollar bill. Wiknik, who appeared quite nervous, placed the five dollar bill in the cash drawer and pulled out four single dollar bills. She counted the four bills and, after a slight pause, took another single dollar bill from the cash drawer. She counted the five single dollar bills and handed them to Cockfield. He then sat down at the first table and ate his lunch. Upon finishing his lunch Cockfield exited via the kitchen door and, at that point, Investigator Begley confronted him as to what had just been observed. When specifically asked by Begley if he had just received a free lunch; five single dollar bills in return for the five dollar bill he had used to pay for his lunch, Cockfield replied , "Yes".

Cockfield was escorted to Internal Security where he provided a written statement admitting to having received free lunches at Cafeteria #10 for approximately 6 months. Cockfield claimed he never solicited the free lunches, rather, it was Wiknik's decision to provide him with free lunches. Cockfield, who described Wiknik as a "very nice person", stated he is not aware of any other employees who have received free meals.

Upon interview, Wiknik confirmed that she had provided Cockfield with a free lunch on June 26, 1991, when she accepted a five dollar bill as payment for his lunch and then returned five single dollar bills to him. Wiknik explained how approximately 1 ½ years ago she was diagnosed as having liver cancer and, since that time, Cockfield has been very nice to her. For example, Cockfield tried to obtain a handicap parking permit for her. According to Wiknik, as a sign of gratitude to Cockfield, she gave him free lunches and an occasional free breakfast. She further explained

21

>how Cockfield would pay for the meal and she would ring the cost up on the register and then return the same amount of money to Cockfield.  In order to balance at the end of the day, she would put her own money in the cash register.  Wiknik said Cockfield had no idea she was actually paying for his meals.  According to Wiknik, she was planning to stop Cockfield's free lunches because some employees had complained about the practice.  Wiknik said no other employee received any free meals.

Def.'s Ex. D.

While Begley testified with confidence about his knowledge of what constituted theft, cross-examination focused on whether Cockfield's activity could be characterized as theft if Wiknik had permission to give away free food.  Then, Begley testified that, as part of his investigation, he had checked with ARA management and been informed that Wiknik did not have permission to give out free food.  Begley, however, was unable to point to any contemporaneous memorialization of this important part of his investigation, casting doubt on whether any such contact occurred.

Begley also testified that he did not credit Wiknik's statement that she paid for Cockfield's food.  Schiffert, however, provided a statement of his observation that Wiknik had rung up Cockfield's order as $2.00 on June 26, 1991, corroborating in part Wiknik's account that she would ring up the order when Cockfield came through her line and pay the balance at the end of the day.  Begley also claimed he investigated whether Wiknik paid for Cockfield's food by checking the teller tapes

22

which showed nothing, but he omitted this important detail from his report.

### C.   Theft by Bernard Cramer

Begley also testified at trial about his investigation of a white male named Bernard Cramer. In 1990, Cramer, a Vice President of Pratt, was found to have engaged in significant theft and embezzlement. See Def.'s Ex. BB (Report on Bernard F. Cramer by R. J. Begley and J. P. Mitchell, dated 10/25/1990). He stole wine from the executive dining room regularly for a year; he charged Pratt $540.00 for catering by ARA at his mother-in-law's funeral; he gave $2000 worth of Waterford crystal to a Pratt computer programmer to complete a project for his personal benefit; and he charged $87.38 to Pratt for a luncheon that was never held. Id. When interviewed initially, Cramer denied that he signed the charge slip for the $540.00 expense. Def. Ex. CC (Statement by Bernard Cramer, dated 10/22/1990 at 3:30 p.m., signed on 10/22/1990 at 6:25 p.m.). Investigator Begley had a Connecticut State Police handwriting examiner compare the signature on the charge slip to Cramer's known signature, and the examiner concluded that Cramer had, in fact, signed for the catering charge. Def. Ex. BB.

Ultimately, Cramer was fired from Pratt. It does not appear in the record that Jones, Walsh, or McGrath, the three potential decisionmakers in Cockfield's termination, were involved with the

Cramer investigation or termination.[8]

### D. Testimony of Graves, Malcolm and Mitchell

Cockfield called three witnesses, Robert Graves, Robert Malcolm, and Billy Mitchell, all long-time Pratt employees, to testify about other employees receiving free food in the Building 10 cafeteria. Graves, who is white, testified that he received free food at times. He also recalled a pot of soup in the cafeteria during the 1990/1991 time frame from which workers would ladle out portions to themselves and then skip the line for the register. Malcolm observed plant personnel receiving free food from the vending machines in the cafeteria. Mitchell observed people receiving free items such as coffee and cookies. He testified that this occurred when the person running the cafeteria was busy in the back and would simply waive the person through or say, "don't worry about it." There was no evidence that the conduct reached the attention of the decisionmakers in Cockfield's case.

### E. Jones' Trial Explanation For Cockfield's Termination

Jones testified that he decided to terminate Cockfield based on specific policies of Pratt covering theft, poor judgment, and

---

[8] Jones also testified regarding a pre-Cockfield termination investigation in which he was involved, regarding an employee who had taken copper from a Pratt facility during lunch, stashed it, picked it up after work, and ultimately attempted to sell it to one of Pratt's vendors. Given the flagrant conduct by Carmer and this employee which undisputedly constituted theft of Pratt property, these examples do not appear to have much relevance to the way Cockfield's circumstances were treated.

24

conduct unbecoming to a senior plant protection officer. He testified that his decision was based on the statements of Cockfield, Wiknik, and Schiffert and his conclusion that the June 26, 1991 hot dog transaction was a continuation of the activity described in Schiffert's statement, which he credited.

With respect to Cockfield's statement, Jones testified he factored into his termination decision the method of exchanging money (a "dishonest way of doing things"), Cockfield's admission that he received free or reduced price lunches for six months, Cockfield's lack of knowledge of anyone else receiving free meals, his disbelief that Cockfield would return to the cashier to pay on the occasions he walked by the cashier, and a belief that Cockfield's statement "...it was a dumb thing to do..." evinced consciousness of wrongdoing. Jones also testified that he did not believe Cockfield's estimation that the free lunches had been ongoing for six months because it conflicted with Schiffert's and Wiknik's estimations of a longer period.

Jones testified he relied on Wiknik's statements that Cockfield was not aware she paid for his lunches, which Jones interpreted to mean that Cockfield knew he was stealing, that she provided free lunches to Cockfield for one and a half years, that only Cockfield received the free lunches from her, the "deceptive" money exchange, and her regret for her actions. Jones did not credit Wiknik's account that Cockfield would

25

sometimes would go directly to a table and then return to the register to pay for his meals, or that she would pay for Cockfield's meals at the end of the day by balancing the register from her own pocket. Jones testified that Schiffert's statement was a major reason for his disbelief of Wiknik, with the result that Jones credited Wiknik's statements insofar as they harmed Cockfield but not where they exonerated him.

To these facts, Jones stated he applied various Pratt rules. He pointed to the Manual:

> GENERAL POLICY INFORMATION
>
> Plant Protection personnel share with all employees of Pratt & Whitney,..., in the benefits, opportunities and responsibilities of employment as outlined in "You and Your Company." In order to more effectively discharge its rather special responsibilities and functions, the Plant Protection Department must operate on the basis of special rules, regulations and standards of personal conduct, performance and appearance.
>
> CONDUCT AND ASSIGNMENTS
>
> 1.   Qualifications
>
> ...The following is a listing of attributes which are considered desirable in Plant Protection personnel:
>
> ...
>
>  - Tact and courtesy
>
>  - Integrity
>
>  - Good Judgment
>
> ...
>
> 7.   Conduct on the Job

> Each member of Plant Protection is expected to develop
> and exhibit standards of behavior that reflect credit
> on Pratt & Whitney.  Officers must be courteous,
> considerate and prompt in dealing with other employees,
> visitors and the public, and must conduct themselves in
> such a manner that the work of the Plant Protection
> Force is effectively accomplished.

Def.'s Ex. A at 1-2, 22.  Jones testified that reflecting credit on Pratt was an important part of being a plant protection officer and that what he perceived as a higher standard, embodied by the Manual's reference to "special responsibilities..." and "special rules," was an important factor in deciding to terminate Cockfield.  Jones also pointed to what he perceived as Cockfield's violations of the "good judgment" and "integrity" provisions as a basis for his decision.  He thought Cockfield had demonstrated a lack of integrity by engaging in an equal money exchange, exuding an indifferent attitude regarding receipt of free lunches, changing the interaction with Wiknik to an equal money exchange after Schiffert confronted Cockfield but not stopping his behavior, and not reporting Wiknik for theft in violation of Cockfield's obligation to do so.  Jones also pointed to what he called conduct unbecoming of a plant protection officer — Cockfield's confronting Schiffert. Jones admitted, however, that such violations could not provide a sufficient basis for terminating an employee, only a basis for lesser disciplinary action.  In this regard, he admitted that Pratt had an informal disciplinary process pursuant to which a verbal

warning was given, then a written employee memorandum, then another memorandum with a final warning and then possibly dismissal.

Jones thus claimed that Cockfield was terminated for his <u>theft</u> of meals, which Jones said was an "especially serious" offense for which termination as a first response was appropriate.[9] For support, Jones pointed to the company theft rule Cockfield supposedly violated by accepting free meals, which was contained in the Supervisor's Policy Guide (General Rules of Conduct) issued January 9, 1976 and revised June 20, 1989:

---

[9] The informal progressive discipline system Jones conceded existed was not required. A portion of Pratt's Supervisor's Policy Guide (Discipline), which was issued January 9, 1976 and revised May 15, 1986, reads:

DISCIPLINE

I.    PURPOSE

The purpose of disciplinary action is to cause undesirable behavior of people to change to reflect desirable standards of conduct. The concept of maintaining discipline involves the supervisor taking action which directs, molds, and strengthens acceptable behavior and is corrective rather than punitive.

Pratt & Whitney has always maintained strict discipline in those areas of conduct in which violations could cause harm to others. This policy has been quite successful considering the size of the work force. However, there is no automatic or "cookbook" formula for discipline. In situations involving problems in such areas as job performance, use of working time, or attendance, the supervisor must examine each case in the light of the individual circumstances and the total job environment. Whatever action is taken, the goal of discipline should be a satisfied and productive work force.

The determination and implementation of appropriate employee discipline is a matter of extreme importance. For this reason, the Personnel Support Office is available to assist supervision in arriving at corrective measures which will be consistent with company policy and equitable to the employee, his or her associates, management, and the public.

Def. Ex. W.

> 2.1 The following practices are strictly forbidden:
> ...
> f.  THEFT -
> - Stealing or having in an employee's possession without proper authority tools, materials, blueprints, or other property of the company, or of other employees,
>
> - Attempting to remove packages or parcels from Company premises without presenting a security pass to the security officer which has been duly signed by the supervisor.

Def.'s Ex. X at 1-2.  Jones admitted that the rule does not say that the receipt of free lunches from the cafeteria is forbidden or that the receipt of free lunches constitutes theft.  He conceded that if no property interest of United Technologies was involved or if Wiknik had authority from ARA to provide free meals then there was no theft.  He testified that he assumed the meals were stolen because Wiknik was merely a cashier and therefore did not have the authority to give away ARA's food, and he believed that, if she had such authority, she would not have needed to engage in the equal money exchange with Cockfield.

## II.  Conclusions of Law

### A.  Title VII Framework

As the parties agree, this Title VII employment discrimination case should be analyzed under the familiar <u>McDonnell Douglas</u>/<u>Burdine</u> three prong burden-shifting framework.  Under that framework, Cockfield first must establish a <u>prima</u>

facie case of discrimination on account of race. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2 Cir. 2000). To do so, Cockfield must prove: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. See e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). The first three elements are conceded here. Cockfield is African American, was qualified for the position of senior plant protection officer, and was terminated. No one particular type of proof is required to satisfy the fourth element, rather it may take a variety of forms, see Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 466-68 (2d Cir. 2002), Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253-54 and n.6 (1981), McDonnell Douglas, 411 U.S. at 802 and n.13, including showing that the employer treated the plaintiff less favorably than co-employees outside plaintiff's protected class who were subject to the same disciplinary standards and engaged in comparable conduct, see Graham, 230 F.3d at 38-40.

Such proof shifts the burden to defendant "to produce evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v.

30

Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal citations, quotations, and alterations omitted). It is satisfied if the proffered evidence "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000)(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

If Pratt articulates a race-neutral reason for Cockfield's termination — theft — Cockfield may "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42. Proof of pretext is not required to prove race discrimination. Reeves, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination... ."); see also Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("Reeves instructed that the combination of evidence establishing a prima facie case and evidence showing that a proffered explanation was pretextual is neither always to be deemed sufficient nor always to be deemed insufficient.").

In other words, an employee does not prevail any time the trier of fact rejects the employer's asserted legitimate, non-discriminatory reasons for terminating an employee. Hicks, 509

31

U.S. at 509. It is paramount to remember when applying the McDonell Douglas/Burdine framework that "[a]lthough intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 503 U.S. at 143 (quotation omitted); see Schnabel, 232 F.3d at 88 n.2. This larger consideration leads the Court to conclude that plaintiff has not met his burden of showing that defendants discriminated against him on the basis of race in violation of Title VII.

### B. Analysis

The Court denied defendant's motion for summary judgment on the proffer that there would be testimony that defendant had fired, then reinstated a white employee who had stolen cafeteria food. This testimony was not offered. Instead, there was only Graves's testimony that he and others had received free food from the cafeteria. Thus it is doubtful that Cockfield has met the burden of his prima facie case. Even assuming he has, and finding, as the Court does, that defendant's articulated legitimate nondiscriminatory reason for firing Cockfield was pretextual, the Court finds that Cockfield has not met his ultimate burden of showing that he was fired because of his race.

#### 1. Legitimate Nondiscriminatory Reason

Jones and Pratt offered no contemporaneous memorialization

32